### NORMAN v. SOUTHERN PISTON RING CO., et al.

Industrial Commission.
May 9, 1952.

John E. Mathews, Jr., Jacksonville, for claimant.

Raymond Ehrlich of Osborne, Copp & Markham, Jacksonville, for the employer and insurance carrier.

B. T. MILLER, Deputy Commissioner.

At the hearing on April 10, 1952 it was stipulated that the claimant was employed by the Southern Piston Ring Co. on November 9, 1951 at an average weekly wage of $50.77. The claimant contended, and the carrier denied, that he had suffered an injury on that day arising out of and in the course of his employment entitling him to compensation.

The claimant testified that he was employed at assembling motor blocks and was injured on November 9, 1951 while working on an Oldsmobile 8 motor. He stated that he was picking up the motor and was holding one end while Joe Davis, a fellow employee, was holding the other end. He had the motor in both hands when suddenly it slipped and twisted, and all the weight was thrown on his right hand. This hurt his arm. He stated that he worked the rest of the day, which was a Friday, and that on Saturday he could not work.

On Monday the bookkeeper sent him to see Dr. Franklin, who x-rayed him and gave him heat treatments for about two weeks. He noted no improvement. Dr. Franklin told him to go back to work and as he did not feel he was able to go back to work the employer sent him to Dr. Moe. Dr. Moe gave him heat treatments for four weeks and the arm got somewhat better. He went back to work again and worked for four days. His duties required him to lift heavy objects and he wasn't able to continue working.

The next job the claimant had was with Mr. A. F. Crews as a chauffeur, which started on January 22, 1952. Mr. Crews paid him one dollar a day and his room and board.

The claimant testified that he could not read and that he could not write except for his name. He said he had not received any compensation to the date of the hearing. He then said that Mr. Newburn, an insurance adjuster, came out to see him while he was staying at his sister's and took his report of the accident. He stated that Mr. Newburn gave this report to his sister to read to him and that she had had a third grade education. She read this statement to him, he said, passing it back to the adjuster to read the parts which she could not. He said that he had not paid either of the doctors.

Mrs. Wilkinson, the sister of the claimant, then testified. She said that Mr. Newburn told them he needed the statement so her brother could get his compensation. She demonstrated her reading ability to the deputy commissioner. She could read one or two words at a time and the end result was not comprehensible. She testified, however, that she usually wore glasses to read, and that she had them at the time she originally read the statement. She did not have her glasses at the hearing. She stated she had read the carbon copy.

Mr. Newburn then testified that when he interviewed him, the claimant said nothing about slipping. He said that the statement which Mrs. Wilkinson read was the original and not the carbon. However, this statement was taken on a statement pad and she read it back to the claimant before the carbons were removed from the pad. He testified that he did not ask specifically whether the motor twisted or turned in the claimant's hand.

At the conclusion of the testimony, the deputy commissioner ordered the carrier to send the claimant to Dr. Paul H. Martin to determine the extent of disability. In his letter of April 29, 1952 Dr. Martin said he thought it likely that the claimant sustained a partial rupture of the supraspinatus tendon in the right shoulder, which is continuing to cause symptoms even after a lapse of months. He said there has already been considerable spontaneous improvement, and the condition may entirely heal itself if protected from re-injury, within another two or three months. The usual experience is that patients with this injury return too early to strenuous activities and continue to suffer slight re-injuries, which unduly aggravate

and prolong the pain and disability. However, in more extensive tears of the tendon cuff of the shoulder, symptoms may be prolonged indefinitely until the rent in the shoulder capsule is repaired surgically. This, however, is a small minority of the cases. He said he was sure the claimant is still disabled for strenuous work. He believed that compensation should be continued for three more months, if he does not recover sooner, and that at that time some decision should be made about possible surgical treatment. He said if the claimant has not almost recovered within three months from now, or at least made marked improvement, the shoulder should be surgically explored, and eventually, either by spontaneous or surgical cure, function should be restored so that there should remain no permanent disability.

At the conclusion of the testimony and all the evidence adduced, the deputy commissioner makes the following findings of fact and conclusions of law:

1. The claimant suffered an injury as a result of an accident arising out of and in the course of his employment on November 9, 1951.

The exact description of the accident in the statement taken by Mr. Newburn follows:

> As I started to straighten up with my end of the load I felt a pain in the upper part of my right arm. The motor did not slip; I did not drop the motor; I did not slip or fall in any way while lifting nor did I twist my body.

It is clear that the claimant's testimony that the motor twisted and shifted weight in his hand was in addition to his account written by the insurance adjuster.

In Neuman v. Shelbourne Grand Hotel (Fla.), 20 So. 2d 677, a hotel hostess who told three doctors that she fell while taking a shower and in a written statement to an adjuster stated that she had fallen while taking a shower and wrote in answer to a questionnaire filed in New York state that she fell while taking a shower, was nevertheless allowed to add to her prior statements the testimony that she slipped and fell while hurrying to answer the telephone. The Supreme Court held that "it was in the nature of additional and not contradictory testimony."

Even if the claimant's testimony should be considered as contradictory to his written statement, the deputy commis-

sioner believes that while the adjuster in all good faith wrote what he considered to be the claimant's statement, the claimant nevertheless did not have the necessary education to read the statement back himself, and his sister's reading ability was so poor that he could not have possibly understood all that he was signing.

The deputy commissioner is convinced that the only way she could find this claim to be not compensable would be to find that the claimant was perjuring himself on the witness stand at the hearing. From his demeanor at the hearing, his response to the questions, and the general agreement between his testimony and the statement given by him to the insurance adjuster, the deputy commissioner finds the claimant to be a credible witness. It was obvious from the testimony that the adjuster had not sufficiently pinpointed the accident to determine whether the motor had slipped in the claimant's hand. The only point at which the testimony of the claimant and Mrs. Wilkinson was in conflict with the testimony of Mr. Newburn was as to whether they read the original statement or whether they read the carbon copy. As counsel for the claimant pointed out, every time Mrs. Wilkinson saw one penciled page, she had to turn two carbon pages, and a discrepancy on this point seems immaterial.

Section 440.26, Florida Statutes 1951, reads that—"in any proceeding for the enforcement of a claim for compensation under this chapter, it shall be presumed in the absence of substantial evidence to the contrary—(1) that the claim comes within the provisions of this chapter." The Supreme Court has held that the Act should be liberally construed and that all doubt should be resolved in favor of the claimant, and that once he has made a prima facie case indicating that it is a compensable injury, there is a duty on the employer or carrier to—"establish his denial by direct and positive evidence, negative evidence will not suffice." Sanford v. A. P. Clark Motors, 45 So. 2d 185, p. 187; and Di Giorgio Fruit Corp. v. Pittman et al, 49 So. 2d 600.

2. The claimant was temporarily totally disabled from the date of the accident on November 9, 1951 until he commenced work for Mr. A. F. Crews on January 22, 1952, with the exception of the four days he worked for Southern Piston Ring Co.

3. The claimant has been since January 22, 1952 and is now temporarily partially disabled. Before his accident the

claimant was earning a salary of $50.77 a week. On January 22, 1952 he started to work for $7 a week, plus his room and board. The deputy commissioner believes that his room and board could not be worth more than $10 a week under these circumstances. Therefore, she finds that the difference between his salary before his accident and his salary after he returned to work is $33.77.

It is accordingly ordered:

1. That the carrier pay the claimant temporary total disability compensation from the date of his accident on November 9, 1951, excluding the four-day waiting period and excluding the four days that he worked, until January 22, 1952, at a rate of $35 a week.

2. That the carrier pay the claimant temporary partial disability compensation from January 22, 1952 until such time as Dr. Martin shall pronounce him able to resume his regular work, at a rate of $20.26.

3. That the carrier furnish medical treatment for the claimant under Dr. Paul H. Martin until such time as Dr. Martin shall discharge him.

The deputy commissioner retains jurisdiction of this matter pending the determination of the need for further medical treatment, and pending the determination of a reasonable fee for the claimant's attorney.